# IN THE MATTER OF THE APPLICATION OF D. RANSOM SHERRETZ FOR A WRIT OF QUO WARRANTO AGAINST NESTA GALLAS, ACTING AS PERSONNEL DIRECTOR, DEPARTMENT OF CIVIL SERVICE, CITY AND COUNTY OF HONOLULU, TERRITORY OF HAWAII.

## NO. 2947.

ARGUED NOVEMBER 13 AND 16, 1953.          DECIDED DECEMBER 28, 1953.

TOWSE, C. J., LE BARON AND STAINBACK, JJ.

Petitioner sought a writ of quo warranto demanding that respondent appear and show cause by what authority she claimed to hold and exercise the office of personnel director of the City and County of Honolulu; petitioner claimed he was appointed and qualified to hold such office on July 1, 1939, entered upon the duties thereof, and still holds the said office.

In her answer respondent admitted that the petitioner-appellee was appointed and qualified as director of personnel in 1939 and held the said office, but alleged he was dismissed by action of the appointing authority in December, 1951, and further denied that the petitioner still holds and occupies the office of personnel director since the said date of his dismissal on December 14, 1951.

Respondent denied that she usurps the said office but avers she was appointed, after duly qualifying therefor, as personnel director by the civil service commission on or about January 1, 1953, to fill the vacancy then legally existing, and claims the right to hold and exercise the functions of the position.

There are other allegations in the answer which need not be noted at this time.

The undisputed facts are in substance that Herbert Kum, Mark R. Murakami and Thomas G. S. Walker were acting as members of the civil service commission and that on December 14, 1951, a vote of the commission was taken for the dismissal of D. Ransom Sherretz, the vote being two to one, Herbert Kum and Mark R. Murakami voting for the dismissal and Thomas G. S. Walker dissenting; that a letter of suspension and dismissal of the same date was written the petitioner herein and a letter of suspension from the mayor to the petitioner was dated December 27, 1951. It was further established that the

respondent's application for the position was accepted and she took the required examination, accepted the position and now holds the same.

It appears from the stipulation and exhibits filed therewith that Herbert Kum was appointed and duly qualified therefor and became a member of the civil service commission on January 2, 1949; that on April 16, 1949, Herbert Kum became a notary public for a term of four years from April 16, 1949; that he continued to exercise the powers, functions and duties of the said office until a judgment was entered on December 7, 1952, in special proceedings (quo warranto) in the circuit court in which the circuit judge held that Herbert Kum had abandoned and vacated the office as a member of the civil service commission on April 16, 1949, and that since that date he had continued to exercise the powers and functions of the said office without warrant or authority of law; he resigned his notary public commission on November 8, 1952, and the same was accepted on November 15 to be effective as of November 8; on November 10, 1952, Herbert Kum was again appointed, with the approval of the board of supervisors of the City and County of Honolulu, as a member of the civil service commission.

The circuit judge filed his decision finding that the civil service commission was not legally constituted on December 14, 1951, the date of its purported suspension and removal of petitioner, because Herbert Kum, a member thereof, had abandoned the office by accepting a notary public commission on April 16, 1949, and thereby was "conclusively presumed to have abandoned and vacated" said office as a civil service commissioner; further, that Kum's second appointment as a member of the civil service commission on November 10, 1952, was premature as

his resignation from his notary public commission was not accomplished until November 15, 1952 (though made retroactive to November 8, 1952) ; that the purported appointment of the respondent as personnel director on January 1, 1953, was void as there was no vacancy to be filled.

A number of questions have been argued by both petitioner and respondent, but whether or not a vacancy existed in the position of personnel director of the department of civil service of the City and County of Honolulu following the dismissal of the petitioner-appellee on December 14, 1951, depends upon the status of Herbert Kum as a *de jure* or a *de facto* member of the civil service commission at the time of the dismissal of the petitioner.

Section 64, Revised Laws of Hawaii 1945, under the heading "Political activities prohibited" provides: "No person shall be eligible for membership or be a member of the commission who occupies any elective or appointive office or position under the territorial or county governments, and no member shall, during his term of office, serve as an officer or committee member of any political party organization, or present himself as a candidate or be a candidate for nomination or election to any public office in any primary or general election. The office of any member who shall violate any of the foregoing provisions shall be conclusively presumed to have been abandoned and vacated by reason thereof, and, upon the governor so finding as a fact, in writing, he shall appoint a qualified person to fill such vacancy. The finding of the governor [mayor, by section 65, R. L. H. 1945, regarding City and County employees] shall be conclusive in all actions and proceedings and upon all officers and courts."

Strong contention is made by the appellant that the

trial judge did not give grammatical construction to the sentence relating to forfeiture of office; that he disregarded that portion reading "and, upon the governor so finding as a fact, in writing, he shall appoint a qualified person to fill such vacancy"; that the sentence relative to forfeiture was not self-executing but that the appointing power (governor or mayor) must find that the member has violated the prohibition and fill the office thereafter.

This argument has appeal, particularly because of the practical necessity of having a ruling by some judicial, executive or administrative authority and thus giving publicity to the fact that the office is vacant. In *Clark* v. *Ennis*, 45 N. J. L. 69 (quoted in *Oliver* v. *Jersey City*, *post*), the court said: "It is clear * * * both upon reason and authority, that a statute declaring an office vacant, for some act or omission of the incumbent, *after he enters upon his duties, does not execute itself."* (Emphasis added.)

There is no incompatibility between holding a commission as a notary public and holding the office of a member of the civil service commission, and any disqualification must be the result of a construction of the statute.

The court below based its opinion on the words "conclusively presumed to have been abandoned and vacated," disregarding not only the concluding part of the sentence relative to forfeiture but the sweeping decisions regarding *de facto* officers. Though we do not so decide, it would seem that in interpreting section 64, and particularly the words "upon the governor so finding as a fact, in writing, he shall appoint a qualified person to fill such vacancy," the "finding" must be relative to a member serving as an officer or committee member of a political party organization or presenting himself as a candidate

for nomination or election, or occupying an elective or appointive position under the territorial or county governments, unless the words "finding as a fact" are entirely superfluous and have no meaning whatever; the sentence would read that the office of any member who shall violate any of the foregoing provisions shall be conclusively presumed to have been abandoned and vacated by reason thereof and the mayor, or governor, shall appoint a qualified person to fill such vacancy. There would be no need whatever for the words "upon the governor so finding as a fact, in writing." Further, the phrase "the finding of the governor [or the mayor]" shall be conclusive in all acts and proceedings upon all officers and courts, would seem to indicate that the statute does not operate *per se,* does not execute itself, but a determination by an executive officer is necessary to be conclusive.

There is no magic in the words "presume" and "vacate" used in the statute. The word "presume" is to take to be true an inference as to the existence of one fact not certainly known, from known or proved existence of another fact. It is a substitute for evidence. The words "conclusive presumption" give rise to a legal presumption of law that may not be rebutted. In other words, it is a legal conclusion. The word "vacancy" may mean a *de jure* or a *de facto* vacancy. (*Alcorn ex rel Hendrick* v. *Keating,* 120 Conn. 427.) Here it would obviously be a *de jure* vacancy which may be filled forthwith by the mayor (or governor, as the case may be). (See *Clark* v. *Ennis, supra.*) As Mr. Kum was still occupying and performing the duties of his office there was no *de facto* vacancy. "It would therefore be a pure solecism to call the office vacant at that time except in the strictly legal sense of having no occupant with a *de jure* title. * * * It is therefore manifest that the words of the statute * * *

declaring that when a commissioner accepts another office his former office shall become 'vacant,' cannot mean, in a situation like this, that it is corporeally vacant, for the person lawfully elected to fill it remained in possession, discharging its duties. * * * The legal meaning of the words in such circumstances is that the office has no occupant who holds by a good title in law, and that the appointing power may at once be exercised to fill it * * *." (*Oliver* v. *Jersey City*, 63 N. J. L. 634, 637.) (*McWhirter* v. *Washington Royalties Co.*, 152 Atl. 220; *Harrison* v. *Simonds*, 44 Conn. 318.)

Certainly the words "conclusively presumed" can be no more effective in removing a man than the words *"ipso facto"* (*Humphrey* v. *Board of Commissioners of City of Pratt* [Kans.], 144 Pac. 197), "thereby terminate," "immediately expire and become vacant," and many similar expressions providing for forfeiture of office.

However, we shall not rule upon this point for, even had Mr. Kum rendered himself ineligible "for membership or [to] be a member of the commission" by accepting an "appointive office * * * under the territorial or county governments," and such act executes itself, we are satisfied that he was at least a *de facto* officer and as such his activities are not subject to collateral attack.

The *de facto* doctrine was ingrafted upon the law some five hundred years ago as a matter of policy and necessity to protect the interests of the public and individuals involved in official acts of a person exercising the duty of an officer without actually being one in strict point of law. A definition frequently given of a *de facto* officer is one whose title is not good in point of law but who is in fact in the unobstructed possession of an office and is discharging its duties in full view of the public in such manner and in such circumstances as not to

present the appearance of being an intruder or usurper. (43 Am. Jur., Public Officers, § 471, p. 225.)

As stated in McQuillin, *Municipal Corporations,* 3d ed., vol. 3, § 12.102, page 379: "Where there is an office, all that is required to make an officer de facto is that the individual claiming the office be in possession of it, performing its duties, and claiming to be such officer under color of an election or appointment, as the case may be."

Again, the same author states: "When the appointing power has made an appointment of a person who has not the qualifications required by law, the appointment is not, therefore, void. The person appointed is de facto an officer; his acts in the discharge of his duties are valid and binding. He may be guilty of usurpation and may be punished for acting without being qualified, but the peace and repose of society require that his official acts so far as others are concerned should be valid. This is true of all officers. *One who becomes disqualified to hold office while in office but continues to exercise the duties of office is a de facto officer."* (McQuillin, *Municipal Corporations, supra,* p. 381.) (Emphasis added.)

It is unnecessary to review at length the legion of cases on the question of *de facto* officers, but to discuss only a few of the many that support the position of the respondent:

The case of *Oliver* v. *Jersey City,* 63 N. J. L. 634, 44 Atl. 709, syllabus: "An officer legally elected and qualified, who enters upon the duties of his office, and afterwards is appointed to and accepts another office, but in good faith continues to publicly discharge the duties of the first, his term not having expired, and no successor having been appointed or elected in his stead, nor any adjudication made against his title,— is an officer *de facto."*

Again, the syllabus in this same case: "When a person legally holding one office is elected or appointed to another, but is prohibited by a statute from holding both, upon accepting the second his *de jure* title to the first ends, and his successor may at once be appointed or elected; but, if the former occupant refuses to vacate the office, his successor will be compelled to take the necessary legal steps to oust him."

In that case the validity of an ordinance was questioned on the contention that one of the commissioners had vacated his office by accepting another office. The statute provided that "no such commissioner should accept or hold any other place of public trust * * * nor any appointment to public office, unless he shall first resign his said office, and if he shall accept such other office without having resigned his office of such commissioner, *upon his acceptance of such place of appointment, his office shall thereupon become vacant.*" (Emphasis added.) Without such official vote, the ordinance would not have passed over the mayor's veto. The argument was made that upon acceptance of the second office the office of commissioner shall "thereupon become vacant' and because the office became vacant Smith was no longer a commissioner. The facts showed that after his appointment to the other office Smith continued to discharge the duties of his office as commissioner and was present when the ordinance was adopted; his name was called, he voted, and his vote was duly recorded. The court stated: "With all these facts and circumstances appearing in the record, and undisputed, we must hold that Smith was a commissioner *de facto*. This conclusion is in accord, we think, with the decisions in this state and elsewhere on this subject. [Citing cases.]"

With reference to the argument that the office of

commissioner was "vacant" the court said: "It would therefore be a pure solecism to call the office vacant at that time, except in the strictly legal sense of having no occupant with a *de jure* title. * * * It is therefore manifest that the words of the statute * * * declaring that when a commissioner accepts another office his former office shall become 'vacant,' cannot mean, in a situation like this, that it is corporeally vacant; for the person lawfully elected to fill it remained in possession discharging its duties. Mere words in a statute cannot alone make an office unoccupied which in fact is occupied. The legal meaning of the words, in such circumstances, is that the office has no occupant who holds by a good title in law, and that the appointing power may at once be exercised to fill it, or, if it is an elective office, the people may elect, and no adjudication is required to declare the vacancy, although the newly appointed or elected officer may find it necessary afterwards to resort to *quo warranto* proceedings to obtain actual possession of the office."

This case, after stating that decisions of like import may be found in every State, held that Smith being a commissioner *de facto* when he voted for the ordinance, the vote must, upon the application of well-settled legal principles, be held valid and effective as to the rights of the public and third persons.

Among the cases discussed in *Oliver* v. *Jersey City*, *supra*, in addition to the cases from New Jersey, is the *Case of Sheehan*, 122 Mass. 445, where a Mr. Hawks, while holding the office of justice of the peace, was elected to the state legislature and had qualified and entered upon his duties as such legislator but continued to act as such justice though the constitution of Massachusetts provided that upon the acceptance of another office that

of justice should become vacant. Mr. Chief Justice Gray held that though the justice ceased to be a justice *de jure*, he was by color of the commission which he still assumed to hold and act under, having the usual signs of judicial office—sitting in the court, using its seal and attended by his clerk—and no other person having been appointed in his stead, a justice of the peace *de facto*.

Also, in *Woodside* v. *Wagg*, 71 Maine 207, where a similar situation occurred in the State of Maine, though the office of judge would be vacated by the incumbent taking a seat as a member of the legislature and his authority as a judge *de jure* would cease, it was held if he continued peacefully to act under his commission and exercise the functions of a judge with the usual insignia of office, he would be an officer *de facto* and his acts, including judgments rendered by him in cases within the jurisdiction of the court, would be valid.

The case of *Clark* v. *Ennis*, 45 N. J. L. 69, hereinbefore referred to, contains a discussion of many decisions relative to *de facto* officers including, among others, *Crawford* v. *Howard*, 9 Ga. 314, where the law declared that if a sheriff did not give bond within thirty days after election "his office shall be vacant." In this case the court held that the court or some official must pronounce the judgment of forfeiture. Similar decisions are cited from Arkansas and Michigan.

In *Hyde* v. *State*, 52 Miss. 665, and *State* v. *Cooper*, 53 Miss. 615, where the statute provided unless the sheriff should give a bond before the first Monday of August he "shall thereby forfeit his office," it was held that there was a judicial question whether there had been a forfeiture which was to be determined by quo warranto proceedings and that the acts of a sheriff *"virtute officii"* were good as those of a *de facto* officer.

In *Clark* v. *Ennis,* 45 N. J. L. 69, it is stated at page 76: "In *Bac. Ab., tit. 'Office and Officers,'* § (*E,*) refer-to the old test acts, it is said: 'Though the words of the above act of 13 *Car.* II., are so very strong as to make such election, &c., void, and those of the 25 *Car.* II., to make such persons disabled in law to all intents and purposes whatsoever to have, occupy or enjoy the said offices; yet it hath been strongly holden, that the acts of one under such a disability, being instated in such an office, and executing the same without any objection to his authority, may be valid as to strangers; for otherwise, not only those who no way infringe this law, but even those whose benefit is intended to be advanced by it, might be sufferers for another's fault, to which they are no way privy; and one chasm in a corporation, happening through the default of one head officer, would perpetually vacate the acts of all others whose authority in respect of their admission into their offices, or otherwise, may depend on his.' "

Another case containing a discussion of the ancient authorities is *State* v. *Carroll,* 38 Conn. 449. This case gives a comprehensive definition of an officer *de facto* as follows: "An officer *de facto* is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid, so far as they involve the interests of the public and third persons, where the duties of the office were exercised, 1. Without a known appointment or election, but under such circumstances of reputation or acquiescence as were calculated to induce people without inquiry to submit to or invoke his action, supposing him to be the officer he assumed to be. 2. Under color of a known and valid appointment or election, but where the officer has failed to conform to some precedent requirement or condition, as to take an oath, give a bond,

or the like. 3. Under color of a known election or appointment, void, because the officer was not eligible, or because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect, being unknown to the public. 4. Under color of an election or appointment by or pursuant to a public, unconstitutional law, before the same is adjudged to be such." It held that judgments rendered by an officer *de facto* were valid.

This case cites the first case relative to the validity of a *de facto* official found in the Year Books, that of *The Abbé of Fountaine* which was tried in 1431. This action was debt on a bond given by one F, as the abbot of the convent of Fountaine for supplies furnished the convent; the action was brought against one R as his successor. The claim was made that F was not duly elected as he had obtained only eight out of the twenty-four votes when the abbacy was vacant, and another had sixteen. This decision, holding that the abbot who was in possession at the time he executed the bond was in substance a *de facto* officer, was followed by many other cases between 1461 and 1833, all of which are discussed in *State* v. *Carroll,* 38 Conn. 449.

In McQuillin, *Municipal Corporations, supra,* many cases are cited where an appointee is at least a *de facto* officer, even though he may not have the qualifications required by law, or fails to qualify by taking the necessary oath or give the necessary bond, or becomes disqualified while in office but continues to exercise the duties of such office. Such *de facto* officers may be executive, legislative, or judicial, elective or appointive; they may be disqualified by statute or by holding over beyond the term, or by accepting an incompatible office, or for

other reasons, and the validity of the acts of such *de facto* officers as regards the rights of third persons and the public is not different from the acts of *de jure* officers. (See 43 Am. Jur., Public Officers, § 495, p. 242, citing cases from every State in the Union and United States Supreme Court decisions.)

The acts of a *de facto* officer are as valid as those of a *de jure* officer as far as third persons are concerned. As stated, this rule is founded in public policy and has the universal sanction of the courts as absolutely essential to the protection of a citizen who is compelled to deal with public officers. This salutary rule will not be departed from unless the language of the Act is susceptible to no other interpretation.

A few examples, among the many, upholding the validity of a *de facto* officer, even though such officer may be absolutely disqualified from a legal standpoint to hold the position, are:

*In Re Oak Street* (Mo.), 273 S. W. 105, where an alderman of a city had removed from the ward in which he was elected to another ward and thereby vacated his office under the Kansas City charter but continued to attend meetings, it was held his vote for a street improvement was valid as he was a *de facto* alderman.

*Johnson* v. *Sanders* (Ky.), 115 S. W. 772, where one holding the office of postmaster was appointed a school trustee, it was held that he was a *de facto* school trustee though he was legally disqualified by reason of being a postmaster, his vote as a *de facto* trustee made valid a contract of employment of a school teacher.

*Ball* v. *United States*, 140 U. S. 118, held that a sentence of death by a *de facto* judge was legal.

*Ex Parte Henry Ward*, 173 U. S. 452, held that where a judge has jurisdiction of the offense and of the accused

and the proceedings are otherwise legal, a conviction is lawful though the judge holding court may be only a *de facto* judge.

As illustrative of the antiquity of the doctrine of *de facto* officials in the English common law, it was held that while a usurper of the crown was in full possession of the sovereignty any attempts against the usurper are treason unless in defense or aid of the rightful king, as allegiance is due to the *de facto* king. Upon this doctrine, after Edward IV recovered the crown which had long been detained by the House of Lancaster, treasons committed against Henry VI were capitally punished though Henry had been declared a usurper by parliament. (Jones' Blackstone, pp. 513, 514. See also Bacon's Abridgement, *supra.*)

For many other cases see 43 American Jurisprudence, Public Officers, pages 240-244; McQuillin, *Municipal Corporations,* 3d edition, volume 3, section 12.106, pages 387-391.

As a number of the decisions dealing with the legality of *de facto* officers discuss the right of third persons dealing with one who appears to occupy an office and conclude that such third persons need not investigate the title of one in possession and obstensibly carrying out the duties of such office, some judges loosely assumed that the doctrine of estoppel is the basis of the legality of the acts of a *de facto* officer. However, this can by no means be the true basis. As stated in volume XII of the Columbia Law Review at page 265: "* * * this [the doctrine of estoppel] clearly cannot be its true basis, for no theory of estoppel could account, for instance, for the illegality of resistance to a *de facto* officer [citing *Garrett* v. *State,* 89 Ga. 416, and other cases], for the validity of sentences pronounced by a *de facto* judge [citing *State* v. *Carroll,*

38 Conn. 449], or for the rule that a corporation *de facto* may as a corporation sue one who has never in any way admitted its corporate existence. [Citing cases.]"

Obviously, the application of maxims and definitions laid down by the courts in particular circumstances which recognized the injustice of holding third persons to the invalidity of an officer's tenure has given rise to some confusion as to the basis of the necessity of holding legal the acts of *de facto* officers.

The circuit court's finding that Kum's second appointment on November 10, 1952, was premature because his resignation as a notary public was not accomplished until November 15, 1952, and thereby his purported appointment was void as Kum was still a notary public, needs little comment as obviously under the cases discussed Kum would at least by his acceptance, by being sworn in and by entering upon the duties and acting as such member, have become a *de facto* officer and the acts of the commission valid.

It is undisputed that Kum was in possession of the office, performing its duties, claiming to be an officer under color of an appointment, his right unquestioned by the appointing authority or by the other members of the commission operating with him; he thus came within the requirements of a *de facto* official. (McQuillin, *Municipal Corporations, supra.*) As a *de facto* officer his acts were as valid as though he had an undisputed legal title.

Reversed.

*N. Felzer,* Deputy City & County Attorney (*J. M. Morita,* City & County Attorney and *H. Sakai,* Deputy City & County Attorney with him on the briefs), for respondent-appellant.

*R. G. Dodge* (*Heen, Kai, Dodge & Lum* with him on the brief) for petitioner-appellee Sherretz.